UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

DIRECTBUY, INC.,                                )
                                                )
              Plaintiff-Counterdefendant,       )
                                                )
        v.                                      )
                                                )        Cause No. 2:15-CV-344-JPK
BUY DIRECT, LLC; TOM POPE; and                  )
ELONA POPE,                                     )
                                                )
              Defendants-Counterplaintiffs.     )

**OPINION AND ORDER**

This matter is before the Court *sua sponte* on the Verified Complaint for Injunctive

Relief and Damages ("Verified Complaint") (DE 1), filed on September 8, 2015 by

Plaintiff/Counterdefendant    DirectBuy,    Inc.    ("Old    DirectBuy")    against

Defendants/Counterplaintiffs Buy Direct, LLC, Tom Pope, and Elona Pope

("Defendants"[1]). Also before the Court is Defendants' Motion for Leave to File Second

Amended Counterclaim ("Motion to Amend"). (DE 90). The Motion to Amend is

opposed by nonparties DirectBuy Home Improvement, Inc., CSC Generation, Inc., and

DirectBuy Operations, LLC (collectively "New DirectBuy"[2]). (DE 97 at 6). These matters

---

[1] In the interest of simplicity, the Court will refer collectively to Buy Direct, LLC, Tom Pope, and Elona Pope as "Defendants," even when discussing their counterclaims.

[2] As indicated in the text, the Court will distinguish the original plaintiff from the nonparties who oppose the Motion to Amend by referring to the former as "Old DirectBuy" and the latter as "New DirectBuy." The reason for using these monikers will become clear later in this opinion and order. The Court cautions, however, that the short-hand reference of "New DirectBuy" for the nonparty opponents to the Motion to Amend

are properly before the undersigned Magistrate Judge for final resolution pursuant to 28

U.S.C. § 636(c).[3] For the reasons discussed in greater detail below, the Court: (1) notifies

the parties that the Verified Complaint brought by Old DirectBuy against Defendants will

be dismissed if no attorney appears on Old DirectBuy's behalf in the next 30 days; and

(2) grants Defendants' Motion to Amend.

## BACKGROUND

### 1.   *Jurisdiction*

This case was initiated by Old DirectBuy, which filed the Verified Complaint on

September 8, 2015. The Verified Complaint alleges that Old DirectBuy is a corporation

organized under the laws of Indiana, with its principal place of business in Merrillville,

Lake County, Indiana. (DE 1 ¶ 8). Defendant Buy Direct is alleged to be a limited liability

company, with Tom Pope and Elona Pope each owning 50% of that company. (*Id.* ¶ 9).

The Popes are residents and citizens of Texas (*id.* ¶¶ 10-11), and, by virtue of the Popes'

citizenship, Buy Direct is also a citizen of Texas. *See Thomas v. Guardsmark, LLC*, 487 F.3d

---

is for convenience only, and is not intended to imply any connection between the original
plaintiff and the nonparty entities, or to suggest that all three nonparty entities can or
should be treated in any future pleadings or filings as a single unit.

[3] Old DirectBuy and Defendants filed their consent to the exercise of jurisdiction by a
United States Magistrate Judge in November 2015, at which time Magistrate Judge Paul
Cherry was assigned to preside over the matter. (DE 22). Upon Magistrate Judge Cherry's
retirement in December 2018, the case was reassigned to the undersigned Magistrate
Judge, following which, the parties were notified that they could file an objection to the
undersigned's continued exercise of jurisdiction within fourteen days of the notice. (DE
34). No objections were filed. Additionally, since any determination on leave to amend is
non-dispositive, the undersigned has authority pursuant to this Court's General Orders
and 28 U.S.C. § 636(b).

531, 534 (7th Cir. 2007). These facts, together with an amount in controversy exceeding $75,000, establish that the Court has subject matter jurisdiction over the Verified Complaint pursuant to 28 U.S.C. § 1332(a) (diversity of citizenship).

### 2. *Pre-Bankruptcy Pleadings*

In 2014, Buy Direct entered into a Franchise Agreement and Asset Purchase Agreement,[4] pursuant to which it acquired a DirectBuy Club® franchise from Old DirectBuy. A DirectBuy Club® is described in the Franchise Agreement as a "buyer club[] that offer[s] and sell[s] memberships to the general public and provide[s] merchandise ordering and other related services to [its] members." (DE 1-1 at 6 (¶ 1.01)). On August 25, 2015, Old DirectBuy terminated Buy Direct's Franchise Agreement, *see* (DE 1-3 at 2), and then filed the Verified Complaint alleging claims against Defendants for breach of the Franchise Agreement, breach of the Asset Purchase Agreement, and breach of the Popes' personal guaranties executed in connection with those Agreements. Old DirectBuy also asserted claims for civil and criminal conversion based on the allegation that, following the termination of Buy Direct's franchise, Defendants had appropriated property belonging to DirectBuy Club® members.

On November 13, 2015, Defendants filed an Answer to Complaint, Affirmative Defenses and Counterclaim (DE 20), in which they alleged counterclaims against Old

---

[4] The Franchise Agreement and Asset Purchase Agreement are referenced in and attached as Exhibits A and B to the Verified Complaint. (DE 1-1, 1-2). As a result, the contents of those documents "become part of the complaint and may be considered as such when the court decides a motion attacking the sufficiency of the complaint." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

DirectBuy for breach of the Franchise Agreement, promissory estoppel, and intentional infliction of emotional distress. The tort claim for intentional infliction of emotional distress is based on allegations of "outrageous sexually harassing behavior" towards Elona Pope, as well as "financial harassment," by the CEO of Old DirectBuy. Defendants filed the First Amended Counterclaim on March 9, 2016 (DE 27), and Old DirectBuy filed an answer and affirmative defenses to the First Amended Counterclaim on March 28, 2016 (DE 28).

### 3.   Old DirectBuy's Bankruptcy Filing

On November 2, 2016, approximately seven months after discovery began in the case, the Court was notified that Old DirectBuy had filed a Chapter 11 petition in Delaware bankruptcy court. (DE 29).[5] As a result of the bankruptcy filing, Magistrate Judge Cherry enter a stay of the case as to Defendants' First Amended Counterclaim against Old DirectBuy. (DE 30 at 1-2).[6] He ordered that the case would remain active and not stayed, however, as to Old DirectBuy's claims in the Verified Complaint. (*Id.* at 2).

Following entry of the court's stay order, on December 13, 2016, counsel for Old DirectBuy filed a status report in which they suggested the court stay the entire case, including Old DirectBuy's claims in the Verified Complaint. (DE 31). As the status report

---

[5] Old DirectBuy and seven related entities each filed separate bankruptcy petitions, and those filings were consolidated in a single proceeding. *See In re DB Holdings Liquidation, Inc.*, Case No. 1:16-bk-12435-CSS (Bankr. D. Del. filed Nov. 1, 2016).

[6] *See* 11 U.S.C. § 362 (providing that pending litigation against a party that files for bankruptcy is automatically stayed).

explained, Old DirectBuy's claims against Defendants were assets of the bankruptcy estate, and thus Old DirectBuy was not in a position to decide on its own whether to proceed with its claims or to withdraw them. (*Id.* at 1-2). The status report therefore suggested that the court administratively close the case "without prejudice to reopening it on the motion of any party should circumstances later call for it." (*Id.* at 2-3). Shortly thereafter, Judge Cherry entered an order staying the entire case. (DE 32).

### 4.   *Proceedings to Lift the Stay after Dismissal of the Bankruptcy Case*

No further proceedings were held in the case until January 23, 2019. On that date, Defendants filed a Motion to Resume Proceedings as to their counterclaims, stating that the bankruptcy proceedings had been dismissed without any discharge of Old DirectBuy, and that they therefore were no longer precluded by the automatic bankruptcy stay from pursuing their counterclaims. (DE 33).

After Defendants filed their motion to reopen, Old DirectBuy's counsel filed a motion to withdraw from this matter. (DE 35). That motion stated that, during the pendency of the Chapter 11 proceedings, the bankruptcy court had authorized the sale of all of Old DirectBuy's assets. (*Id.* ¶ 2). The sale had taken place in February 2017, and the proceeds did not leave sufficient financial resources for Old DirectBuy to propose a viable reorganization plan. (*Id.*). As a result, the bankruptcy court dismissed the Chapter 11 proceedings in November 2017. (*Id.*). The motion further stated that "the Indiana Secretary of State had since dissolved" Old DirectBuy, and that "compan[y] therefore no longer exit[s]." (*Id.*). Counsel stated that they sent a letter in June 2017 to Old DirectBuy's then CEO, informing him of their intent to withdraw their appearances in this matter, as

required by N.D. Ind. R. 83-8. (*Id.* ¶ 3). The motion also argued that good cause existed to dispense with the notice requirement in the local rule[7] because Old DirectBuy "has been dissolved, its assets liquidated, and it no longer exists. In sum, there is no client for counsel to represent, no client to communicate with, and no client to provide advice, to, and/or receive instruction from regarding future handling of the matter." (*Id.* ¶ 4). The motion identified the last known contact information for Old DirectBuy as being Dylan Astle, Chief Operating Officer, 8450 Broadway, Merrillville, Indiana. (*Id.* ¶ 6).

On February 7, 2019, the Court lifted the stay as to the entire case. (DE 36 at 2). The Court also allowed Old DirectBuy's counsel to withdraw their appearances. (*Id.*). In doing so, however, the Court noted that "a corporation cannot litigate pro se," and "an attorney appearance will be required for any future case participation" by Old DirectBuy. (*Id.*).

### 5.   *The Motion to Amend*

Following the lifting of the stay, Defendants pursued discovery on their counterclaims against Old DirectBuy. Those discovery efforts were largely directed at New DirectBuy, to whom Old DirectBuy had sold its assets during the bankruptcy proceedings.[8] Defendants deposed Old DirectBuy's former Chief Operating Officer,

---

[7] The local rule provides in relevant part that, to withdraw an appearance, attorneys must file a motion requesting leave to do so, and, unless another attorney has appeared for the party, the motion must include (1) satisfactory evidence that the attorney gave the party written notice of the attorney's intent to withdraw at least seven days before filing the motion; and (2) in civil cases, the party's last known contact information, including an address and telephone number. *See* N.D. Ind. R. 83-8(c).

[8] The record reflects that the purchaser of Old DirectBuy's assets was CSC Generation, Inc., which then changed its name to DirectBuy Home Improvement, Inc. after the sale. The record is unclear as to the exact relationship of DirectBuy Operations, LLC to either

Dylan Astle, and also obtained relevant business records belonging to Old DirectBuy. Defendants then filed the Motion to Amend with a supporting memorandum (DE 90, 91). The Motion to Amend seeks to assert additional counterclaims against New DirectBuy under a theory of successor liability. New DirectBuy opposes the Motion to Amend, arguing that successor liability is precluded by bankruptcy law and the terms of the sale by which New DirectBuy acquired Old DirectBuy's assets.

DISCUSSION

## I.   OLD DIRECTBUY'S VERIFIED COMPLAINT

The claims in the Verified Complaint against Defendants are still pending, despite the fact that Old DirectBuy has not been represented by an attorney since its former counsel withdrew in February 2019. Not surprisingly, Old DirectBuy has taken no action in this matter to pursue its claims. It is undisputed that Old DirectBuy has been dissolved. Its dissolution, as a general manner, "puts an end to its existence, the result of which may be likened to the death of a natural person." *United States v. P. F. Collier & Son Corp.*, 208 F.2d 936, 937 (7th Cir. 1953). But a corporation's dissolution does not necessarily mean that litigation in which it was involved prior to its dissolution automatically ends upon its dissolution, for there may "be some statutory authority for the prolongation of its life, even for litigation purposes." *Id.* (internal quotation marks and citations omitted) The effect of dissolution is determined by the law of the state of incorporation. *Id.* Old

---

CSC Generation, Inc. or DirectBuy Home Improvement, Inc., or, assuming Defendants have a viable successor liability counterclaim based on Old DirectBuy's sale of its assets, which of these entities would be the proper successor entity to sue.

DirectBuy was incorporated in Indiana, so the effect of its dissolution is determined by Indiana Code § 23-1-45-5(b). That statutory provision states that the "[d]issolution of a corporation does not … abate or suspend a proceeding pending by or against the corporation on the effective date of dissolution." IC § 23-1-45-5(b)(6). As a result of IC § 23-1-45-5(b)(6), Old DirectBuy's dissolution does not automatically terminate its breach of contract and conversion claims against Defendants.

Nevertheless, as the Court stated in its order granting counsel's motion to withdraw, a corporation cannot litigate in federal court without attorney representation. *See Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003) (citing *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201–02 (1993)). In the three years since the Court granted counsel permission to withdraw from this matter, no attorney has filed an appearance on behalf of Old DirectBuy. Accordingly, the Court *sua sponte* warns that it plans to dismiss Old DirectBuy's claims in the Verified Complaint against Defendants absent any appearance of counsel on behalf of Old DirectBuy in the next 30 days. *See, e.g., The Capital Grp., Inc. v. Gaston & Snow,* 768 F. Supp. 264, 266 (E.D. Wis. 1991) (dismissing claims of unrepresented corporation without prejudice).[9]

---

[9] This order does not resolve any issue as to Defendants' counterclaims against Old DirectBuy. Notwithstanding its dissolution, Defendants may proceed to a default judgment against that entity if they so wish. *See* IC § 23-1-45-7(d) ("A claim may be enforced under this section (1) against a dissolved corporation, to the extent of its undistributed assets; or (2) if the assets have been distributed in liquidation, against a shareholder of the dissolved corporation to the extent of the shareholder's pro rata share of the claim or the corporate assets distributed to the shareholder in liquidation …."). Should Defendants wish to dismiss their counterclaims against Old DirectBuy, however, they may file the appropriate papers to do so.

## II.   DEFENDANTS' MOTION TO AMEND

Federal Rule of Civil Procedure 15(a) provides that courts should freely give leave to amend pleadings prior to trial when justice so requires. *See* Fed. R. Civ. P. 15(a). "District courts, nevertheless, have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 693 (7th Cir. 2017) (internal quotation marks and citation omitted). New DirectBuy argues that the Motion to Amend should be denied because the proposed amendment adding counterclaims against it would be futile. Although not argued as a separate basis for denying leave to amend, New DirectBuy also suggests the proposed amendment to Defendants' counterclaims should be disallowed because of undue delay, bad faith, and/or dilatory motive on Defendants' part. The Court first will address a procedural issue under the local rules raised by New DirectBuy, and then discuss the undue delay, bad faith, and dilatory motive issue. With those preliminary matters out of the way, the Court will turn to New DirectBuy's futility arguments.

### A.   FAILURE TO ATTACH PROPOSED AMENDED COUNTERCLAIM

New DirectBuy argues the Court should deny the Motion to Amend because Defendants have not submitted a proposed amended counterclaim, as required by this

Court's Local Rules.[10] In response, Defendants cite to subsection (c) of the Rule, which states that "[f]ailing to comply with this rule is not grounds to deny the motion." N.D. Ind. R. 15-1(c). While failing to attach a proposed amendment is not a reason by itself to deny the motion, nothing in subsection (c) of the Local Rule suggests that compliance with subsection (a) is optional, notwithstanding its use of mandatory language ("a pleading *must* include"). If a party fails to attach a proposed amendment to a motion to amend, the motion to amend should not be denied for that reason, but the moving party should still comply with subsection (a) by submitting a proposed amendment through either an amended motion or by attaching it to a reply brief. Defendants have done neither. Instead, they state that they will "supplement their Motion with a proposed Second Amended Counterclaim, if the Court deems it necessary." (DE 98 at 1). Waiting to comply with subsection (a) of Local Rule 15-1 until the court orders compliance only contributes to further delay in these proceedings.

Still, the Court is mindful that New DirectBuy, in resisting Defendants' discovery requests (as will be discussed in the next section), has repeatedly called the Court's attention to the fact that it is not a party to these proceedings. New DirectBuy's nonparty status raises questions about its standing to contest the Motion to Amend. New DirectBuy "should not be able to have one foot in the case and one foot out." *Smith v. TFI Family Servs., Inc.,* No. 17-02235-JWB-GEB, 2019 WL 1556250, at *3 (D. Kan. Apr. 10, 2019). Yet

---

[10] *See* N.D. Ind. R. 15-1(a) ("Motions to amend a pleading must include the original signed proposed amendment as an attachment.").

New DirectBuy appears to have done just that, contesting discovery on the ground that it is not a party, while at the same time assuming party status by opposing the Motion to Amend. Courts have held that the most efficient and procedurally proper way to proceed in these circumstances is to strike the nonparty's opposition to the motion to amend for lack of standing and grant the motion to amend as unopposed.[11]

If the Court were to take that approach, however, New DirectBuy would likely still raise their futility arguments all over again in a motion to dismiss once the Second Amended Counterclaim is filed. They have already briefed the pertinent issues and proceedings in a case that is getting rather old. At this juncture of the proceedings, the further delay and cost involved in striking the opposition to the Motion to Amend, only to have the same issues presented almost immediately again in a motion to dismiss,

---

[11] *See, e.g., Bittner v. Waterford Twp. Sch. Dist.*, No. 1:18-cv-10990-RMB-KMW, 2020 WL 10223599, at *2 (D.N.J. Jan. 13, 2020) (finding that a proposed, new, third-party defendant that has yet to be named in the action lacked standing to oppose a motion to amend the pleadings); *Smith*, 2019 WL 1556250, at *3 (holding that if nonparties "wish[ed] to invoke Rule 12(b) defenses, they must . . . do so by filing a motion or responsive pleading, which can only procedurally occur after they have been served with the Amended Complaint" (footnote omitted)); *Raab Family P'ship v. Borough of Magnolia*, Civil No. 08-5050 (JBS/AMD), 2009 WL 10689669, at *4 (D.N.J. Oct. 30, 2009) (holding that current defendant could not assert futility argument on behalf of individuals who were not presently parties, stating that "[t]here is no 'authority that would ... authorize present parties who are unaffected by the proposed amendment to assert claims of futility on behalf of the proposed new defendant'" (quoting *Clark v. Hamilton Mortg. Co.*, No. 1:07-252, 2008 WL 919612, at *2 (W.D. Mich. Apr. 2, 2008))); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 246 F.R.D. 143, 146 n.1 (E.D.N.Y. 2007) (same); *Vasquez v. Summit Women's Ctr., Inc.*, No. Civ. 201CV955PCD, 2001 WL 34150397, at *1 n.1 (D. Conn. Nov. 16, 2001) (stating that "[t]he standing of non-parties to challenge a motion for leave to file an amended complaint that seeks to add them is, at best, dubious" (citing 3 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE ¶ 14.21(2) (3d ed. 1999))).

seems unnecessary and unwarranted. Accordingly, the Court will consider New DirectBuy's opposition in ruling on the legal sufficiency of the Motion to Amend. Perhaps New DirectBuy will nonetheless move to dismiss any Second Amended Counterclaim. Yet the Court's consideration of New DirectBuy's opposition in ruling on the current Motion to Amend, instead of striking it, may provide some clarity on the relevant legal issues for any proceedings that follow and thereby prevent further delay in this litigation.

### B.    DELAY, BAD FAITH, AND/OR DILATORY MOTIVE

New DirectBuy describes Defendants' Motion to Amend using colorful language suggesting undue delay, bad faith, and dilatory motive. According to New DirectBuy, Defendants "have had nearly four years since entry of the [bankruptcy court] Sale Order and two years since the time they dragged non-parties Mr. Astle and [DirectBuy Home Improvement] into this case to concoct amended claims." (DE 97 at 12). New DirectBuy believes that "Defendants have held this case open for more than four years without an active adverse party solely to extract discovery from non-parties under the guise of investigating their claims against a defunct and unrepresented entity." (*Id.* at 6). New DirectBuy argues that Defendants' Motion to Amend comes "[a]fter years of delay and gamesmanship," that it seeks "to add unknown claims against [New DirectBuy] based on a futile theory of successor liability," a request that "is precisely what [New DirectBuy] feared would happen," and that it "comes *four and a half years after* [New DirectBuy] purchased some of the assets of the now-defunct plaintiff [Old] DirectBuy." (*Id.* (emphasis in original)). New DirectBuy contends that Defendants' failure to assert their amended counterclaims four and a half years ago when the assets were sold is

inexcusable because Defendants "filed proofs of claim in [Old DirectBuy's] bankruptcy, timely received notice of the U.S. Bankruptcy Court's proposed sale order—which expressly excluded their counterclaims—yet did nothing to object to or appeal the final Sale Order." (*Id.*).

New DirectBuy's characterizations regarding Defendants' conduct in these proceedings following the lifting of the stay requires context. Beginning with the issue of delay, New DirectBuy suggests that Defendants should have filed a motion to amend their counterclaims when the asset sale was approved by the bankruptcy court four and a half years ago. However, Defendants' counterclaims were stayed at that time. Moreover, the facts on which their proposed amended counterclaims are based were not known--indeed had not necessarily even happened yet, as Defendants' counterclaims are premised, at least in part, on the manner in which New DirectBuy continued the business of Old DirectBuy *following* the sale. And, as will be discussed later in this opinion, the assertion that Defendants received "timely" notice of the sale, including that the sale expressly excluded their counterclaims, lacks adequate support.

Insofar as delay following the lifting of the stay is concerned, it is true that the Court has expressed concern in past proceedings over the length of time it has taken Defendants to file their Motion to Amend. But the Court cannot say that the delay is *all* attributable to Defendants. Although this case was filed more than six years ago, it had been pending barely a year when Defendants' counterclaims were stayed because of the bankruptcy filing by Old DirectBuy. Therefore, it is unclear from the record what amount of time for discovery following the lifting of the stay was reasonably necessary. It does

appear from the record that Defendants were active in pursuing their counterclaims following the lifting of the stay. But their efforts encountered strong resistance from New DirectBuy, to whom most of Defendants' discovery was directed.

The original objector to Defendants' discovery was Dylan Astle, the individual identified by Old DirectBuy's former counsel as the last known contact for Old DirectBuy, with the same Merriville address as Old DirectBuy[12] (and, as will be seen, also the business address for New DirectBuy). Mr. Astle appeared in this matter to seek a court order quashing a subpoena that Defendants had issued for his deposition. Mr. Astle, through counsel, opposed the subpoena for his deposition on the assertion that he was a current employee of New DirectBuy, a nonparty in the case. Mr. Astle strenuously asserted that deposing him was improper because he was *not* an officer or employee of *any* party to these proceedings (DE 45, ¶ 3; *see also* DE 48, 49), an assertion that failed to address the fact (which he never disputed) that Mr. Astle was the former Chief Operating Officer of Old DirectBuy, a party to this case, and was personally named by Old DirectBuy's former counsel as the future contact for Old DirectBuy following counsel's withdrawal.[13]

---

[12] The bankruptcy court order approving the sale of Old DirectBuy's assets notes that the eight related corporate entities, who are identified as the "Debtors" in that proceeding, have their "corporate headquarters [at] 8450 Broadway, Merrillville, IN 46410." (DE 97-5 at 1 n.1).

[13] Mr. Astle also asserted that he had "no unique knowledge of the issues in this litigation" (DE 49 at 6), when one of the exhibits to Old DirectBuy's Verified Complaint was an email from Mr. Astle to the Popes (DE 1-3 at 8); *see also* DE 56 at 6.

Mr. Astle was ordered to sit for his deposition (DE 58), during which Defendants learned that New DirectBuy was in possession of Old DirectBuy's corporate records. After the deposition, Defendants sought to obtain relevant business records of Old DirectBuy from New DirectBuy, but were unsuccessful in their initial efforts. Several hearings were held to discuss the status of Defendants' efforts to obtain documents from New DirectBuy, at which Mr. Astle's (and later New DirectBuy's) counsel appeared to argue against the requested discovery.[14] Ultimately, Defendants had to file a motion to compel. (DE 73, 74, 78). A hearing was held at which New DirectBuy's objections to the document subpoena Defendants had issued to obtain Old DirectBuy's records were mostly overruled. (DE 81).

Without suggesting that all the delay was attributable to New DirectBuy, the above discussion indicates that New DirectBuy's resistance to discovery played a role in whatever delay has occurred in these proceedings following the lifting of the stay. New DirectBuy nevertheless justified its discovery objections by taking issue with the appropriateness of Defendants conducting any discovery when their opponent is a dissolved corporation and the targets of the discovery are nonparties to the litigation. As previously discussed, however, Defendants' counterclaims against Old DirectBuy did not automatically abate when that corporation was dissolved. *See* IC § 23-1-45-5(b)(6).

---

[14] Initially, New DirectBuy's counsel appeared on behalf of Mr. Astle only. (DE 63). A short time later, however, Mr. Astle's counsel filed appearances on behalf of New DirectBuy. From that point forward, New DirectBuy replaced Mr. Astle as the nonparty opposing Defendants' discovery efforts. (DE 65).

Furthermore, discovery concerning Old DirectBuy was proper, notwithstanding its dissolved status. "A corporation is simply not 'dead and buried' until it has fully complied with the applicable state dissolution laws and remains amenable to suit by its creditors." *United States v. SCA Servs. of Ind., Inc.*, 837 F. Supp. 946, 953 (N.D. Ind. 1993). The fact that the discovery in question relates to the records of a now defunct corporation in the possession of nonparties to the litigation does not render it inappropriate.[15]

New DirectBuy takes issue with the underlying motive for Defendants' discovery, which it says was to find factual support for a claim of successor liability against it, calling Defendants' discovery a fishing expedition. But the discovery was for the most part upheld by the Court as proper. While there were no successor liability counterclaims pending at the time, the pending counterclaims against Old DirectBuy were sufficient to support the requested discovery. The Federal Rules permit discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense, and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id*. The party objecting to the discovery request bears the burden of showing why the request is improper. *See McGrath v. Everest Nat'l Ins. Co.*, 625 F. Supp. 2d 660, 670 (N.D. Ind. 2008). "Discovery that is relevant to the parties' claims or defenses may also support amendment of the pleadings

---

[15] *See, e.g., St. Paul Fire & Marine Ins. Co. v. Schilli Transp. Servs., Inc.,* No. 2:08-cv-176, 2010 WL 2629485, at *3 (N.D. Ind. June 28, 2010) (rejecting argument that it would be unduly burdensome to require related entities to "sift[] through" the records of a now defunct corporation, citing in support the duty under IC § 23–1–45–5 of "a dissolved corporation to 'continue its corporate existence ... to wind up its business and affairs'").

to add a new claim or defense that affects the scope of discovery." Fed. R. Civ. P. 26(b)(1), Advisory Committee Notes, 2015 Amendment.

Under this standard, facts concerning Old DirectBuy's sale of its assets to a third party are relevant to the question of whether those counterclaims are still viable, albeit against a different corporation. To use the same analogy the court in *United States v. SCA Services of Indiana, Inc.* adopted from *Columbia River Service Corp. v. Gilman*, 751 F. Supp. 1448, 1453 (W.D. Wash. 1990), "although [New DirectBuy] may have shown that [Old DirectBuy] is 'dead,' . . . [Defendants] [are] entitled to determine whether the corporation has been 'buried.'" *SCA Servs.*, 837 F. Supp. at 954–55. In other words, Defendants were entitled to discovery to determine if a successor entity exists that can be sued under some version of state or federal law. *See id.* at 955 (finding that claims against a dissolved corporation involved "genuine issues of material fact" as to "whether [the dissolved corporation] ha[d] distributed all of its assets and whether [it] continue[d] to conduct business," as well as "whether [the corporation's] assignment to [a third party] was a fraudulent conveyance").

Finally, New DirectBuy argues Defendants' discovery was improper because it cannot be held liable as a successor to Old DirectBuy. Whether Defendants can state a viable successor liability theory of recovery against New DirectBuy, however, is a merits issue, "which is impossible to adjudicate without discovery." *St. Paul Fire & Marine Ins. Co.*, 2010 WL 2629485, at *3. A defense to successor liability is not the same as immunity from being sued, and New DirectBuy "may not avoid its participation in the discovery process merely by asserting its defense to the underlying claim[s]." *Id.*

17

In short, there is no basis for finding that Defendants acted with undue delay, bad faith, or dilatory motive in the timing of their Motion to Amend or their efforts to take discovery following the lifting of the bankruptcy stay, which efforts have led to the Motion to Amend presently before the Court.

### C.   FUTILITY ARGUMENTS

It is well established that leave to amend may be denied under the futility rule where the proposed amendment would not withstand a motion to dismiss. *See Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 974 (7th Cir. 2001). The first issue the Court has to confront in addressing New DirectBuy's futility arguments is what law applies. After addressing that issue, the Court will discuss New DirectBuy's futility arguments as to (a) state successor liability law; (b) the bankruptcy court's Sale Order; and (c) § 363(f) of the Bankruptcy Code.

### 1.   CHOICE OF LAW

Neither party has adequately addressed the choice of law that would apply to Defendants' state law successor liability claims if those claims are not barred by federal bankruptcy law. Instead, they both cite to contractual choice of law provisions, albeit in different contracts.[16] Those contractual provisions, however, control how those

---

[16] New DirectBuy cites to the New York choice of law provision in the Purchase Agreement by which Old DirectBuy sold its assets to New DirectBuy (DE 97 at 14 n.7), while Defendants cite to the Indiana choice of law provision in the Franchise Agreement between Old DirectBuy and Buy Direct (DE 91 at 4).

agreements are to be construed, *not* their " legal effect" or "questions of traditional tort law unrelated to the contract[s]." *Travis v. Harris Corp.,* 565 F.2d 443, 446 (7th Cir. 1977).

A federal court sitting in diversity applies the substantive law of the state where it sits, including the choice of law principles of that state. *Land v. Yamaha Motor Corp. U.S.A.,* 272 F.3d 514, 516 (7th Cir. 2001).[17] An Indiana court would apply the law of the state "with the most significant relationship to the occurrence and the parties" with respect to the particular issue at hand. *Cooper Indus., LLC v. City of So. Bend*, 899 N.E.2d 1274, 1290–91 (Ind. 2009) (citing Restatement (Second) of Conflict of Laws § 302). The state with the most significant relationship to a dispute over whether a plaintiff can maintain a claim for successor liability would usually be the state of incorporation of the previous entity, *id.,* but could also be "the situs of the injury and domicile of [the injured party]," *Travis,* 565 F.2d at 446 (finding the place of injury to be the state with the most significant relationship to successor liability claim).

While Texas, the state where the Popes reside, is likely the situs of Defendants' injury, Indiana also has a strong connection with Defendants' successor liability claims. It is the place where Old DirectBuy was incorporated, where it maintained its headquarters throughout its relationship with Defendants, and where it was dissolved

---

[17] Defendants' claims for which they seek to hold New DirectBuy liable are state common law claims for breach of contract and intentional infliction of emotional distress. Thus, state, not federal, common law applies to the successor liability issue. *See R.C.M. Exec. Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630, 634-45 (S.D.N.Y. 1995) (noting that many courts apply federal common law of successor liability where the underlying claims arise under federal law).

following its asset sale to New DirectBuy. Although the exact facts are not known at this time, the record suggests that Indiana may also be the place where New DirectBuy currently maintains its corporate headquarters and/or conducts the same business as Old DirectBuy did, operating from the same corporate location. *See infra,* Section II, C, 2. Indiana also is the forum state, and the Seventh Circuit has said that, "[w]here there is no disagreement among the contact states, the law of the forum state applies." *Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994) (internal quotation marks and citations omitted). The Indiana Supreme Court has noted that successor liability theories "are widely accepted in the law of American states, including Indiana, New York, and Delaware." *Cooper Indus., LLC*, 899 N.E.2d at 1288; *see also Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995) (stating that most states have adopted successorship liability exceptions to the general no-liability rule). Therefore, in the absence of any showing of a conflict with any other relevant state's law, the Court will cite to Indiana law in its discussion of relevant common law successor liability principles.[18]

## 2.   INDIANA SUCCESSOR LIABILITY PRINCIPLES

Setting aside that there is no proposed amendment currently before the Court to evaluate for futility under Rule 12(b)(6), the record contains sufficient information for the Court to conclude that, apart from New DirectBuy's arguments based on federal

---

[18] The parties' failure to develop a legal argument for a different choice of law constitutes a waiver for present purposes, but they are free to challenge the Court's decision to apply Indiana law if they wish to revisit the issue later.

bankruptcy law (addressed in the last two sections of this Order), Defendants are likely to be able to plausibly allege a claim against New DirectBuy under one or more theories of successor liability.

The general rule in Indiana (and also nearly everywhere) is that the purchaser of a corporation's assets does not assume the debts and liabilities of the seller. *Sorenson v. Allied Prods. Corp.*, 706 N.E.2d 1097, 1099 (Ind. Ct. App. 1999) (citing *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1233 (Ind. 1994)). Importantly, however, there are several "[g]enerally recognized exceptions to this rule." *Id.* The exceptions include: "(1) an implied or express agreement to assume the obligation; (2) a fraudulent sale of assets done for the purpose of escaping liability; (3) a purchase that is a de facto consolidation or merger; or (4) instances where the purchase is a mere continuation of the seller." *Id.* Defendants argue that New DirectBuy is subject to successor liability counterclaims under the second through fourth exceptions.

*(2) Fraudulent Sale.* The fraudulent sale theory of successor liability requires proof of fraudulent intent.

> Fraudulent intent can be inferred from certain indicia called "badges of fraud." Some of the badges from which fraudulent intent can be inferred include: 1) the transfer of property by a debtor during the pendency of a suit; 2) a transfer of property that renders the debtor insolvent or greatly reduces his estate; 3) a series of contemporaneous transactions which strip the debtor of all property available for execution; 4) secret or hurried transactions not in the usual mode of doing business; 5) any transaction conducted in a manner differing from customary methods; 6) a transaction whereby the debtor retains benefits over the transferred property; 7) little or no consideration in return for the transfer; and 8) a transfer of property between family members. When there is a

> concurrence of several badges of fraud an inference of
> fraudulent intent may be warranted. However, no one badge
> of fraud constitutes a per se showing of fraudulent intent.
> Rather, the facts must be taken together to determine how
> many badges of fraud exist and if together they constitute a
> pattern of fraudulent intent.

*Lee's Ready Mix & Trucking, Inc. v. Creech*, 660 N.E.2d 1033, 1037 (Ind. Ct. App. 1996).

Defendants argue that they can plausibly allege fraudulent intent in the sale of Old DirectBuy's assets to New DirectBuy based on the following factual allegations: (1) the sale was completed during the pendency of this litigation; (2) the sale rendered Old DirectBuy insolvent; (3) the sale was done in a manner that is different from customary methods; (4) the sale was a hurried transaction not in the usual mode of doing business; and (5) the assets were sold for little or no comparative consideration. (DE 91 at 5-6). Defendants also contend that, more than seventeen months before Old DirectBuy filed for bankruptcy, Tom Pope had a conversation with the Vice President of the controlling majority shareholder of Old DirectBuy in which the latter said that "he was planning on 'restructuring' [Old] DirectBuy so that the pending lawsuits would go away." (DE 92-2 ¶¶ 7-8).[19]

---

[19] New DirectBuy argues the Court should not consider this allegation because it is hearsay. But the Court "is not passing on the admissibility of evidence." *Baldwin v. Pelican Reef Mgmt., LLC*, No. 18-CV-00586-PAB-NYW, 2019 WL 5095715, at *3 (D. Colo. July 25, 2019), *report and recommendation adopted*, 2019 WL 5095656 (D. Colo. Aug. 30, 2019). "[T]he appropriate standard of legal sufficiency is outlined in Federal Rule of Civil Procedure 12(b)(6), which does not require the court to consider only admissible evidence." *Id.* (internal citation omitted); *see also Mitchell v. Werner Co.*, No. C11-5543BHS, 2012 WL 934128, *2 (W.D. Wash. Mar. 20, 2012) (denying the defendant's motion to strike an exhibit on hearsay grounds because it "failed to show that the Court must only rely on admissible evidence when considering a motion to amend").

*(3) De facto merger and (4) Mere Continuation Doctrines.* An asset transfer may be considered a de facto merger "where the economic effect of the transaction makes it a merger in all but name. Some pertinent findings might include continuity of the predecessor corporation's business enterprise as to management, location, and business lines; prompt liquidation of the seller corporation; and assumption of the debts of the seller necessary to the ongoing operation of the business." *Cooper Indus., LLC,* 899 N.E.2d at 1288 (citing cases). "The doctrine of 'mere continuation' has a slightly different focus. It asks whether the predecessor corporation should be deemed simply to have re-incarnated itself, largely aside of the business operations. Factors pertinent to this determination include whether there is a continuation of shareholders, directors, and officers into the new entity." *Id.* at 1290 (citing cases).

Defendants attach documents to their Motion to Amend showing that Old DirectBuy's assets were sold to CSC Generation, Inc., a Delaware company originally incorporated in 2013 under the name Ice.com Round2, Inc. (DE 92-5 at 5). Defendants contend that the name CSC Generation, Inc. came from Old DirectBuy's corporate headquarters in Merrillville, Indiana, which Old DirectBuy referred to as its corporate support center, or CSC for short. (DE 92-2 ¶ 9). CSC Generation, Inc. registered to do business as a foreign corporation in Indiana on March 7, 2017, listing the former Merrillville address of Old DirectBuy both as its principal office address as well as its registered office address. (DE 92-3 at 2). It then immediately registered to transact business under the assumed name of "DirectBuy." (DE 92-4). Six months later, it changed its corporate name from CSC Generation, Inc. to DirectBuy Home Improvement, Inc. (DE

92-5 at 5). DirectBuy Home Improvement, Inc. continued to do business in Indiana under the assumed name of DirectBuy until May 3, 2021, when it cancelled its assumed name registration certificate. (DE 92-6 at 1). Around the same time, another Delaware entity named DirectBuy Operations, LLC, newly formed in February 2021 (DE 92-7 at 3), registered to do business in Indiana as a foreign corporation, listing its street address as the same address in Merrillville, Indiana that used to be Old DirectBuy's corporate headquarters (*id.* at 1-2). A month after DirectBuy Home Improvement, Inc. cancelled its assumed name registration certificate, DirectBuy Operations, LLC filed a certificate to transact business under the assumed name "DirectBuy." (DE 92-8).

Defendants contend that some officers, directors, or shareholders of Old DirectBuy continued as officers, directors, or shareholders of New DirectBuy. (DE 91 at 7). In particular, two majority shareholders in Old DirectBuy--HIG Bayside Capital and Trivest--may also be majority shareholders in New DirectBuy. (DE 92-2 ¶ 6). Defendants also contend that individuals associated with New DirectBuy, such as Justin Yoshimura, the Chairman (DE 92-3 at 2) and/or CEO (DE 92-5 at 5) of CSC Generation, Inc., were also associated with Old DirectBuy. (DE 92-2 ¶¶ 4-5). The record also suggests plausible allegations can be made as to the continuity of Old DirectBuy's business in terms of location and business lines; the prompt liquidation of Old DirectBuy; and New DirectBuy's assumption of Old DirectBuy's debts necessary to the ongoing operation of the business.[20]

---

[20] *See, e.g., Cont'l Cas. Co. v. Construct Sols., Inc.*, No. 1:15-cv-01848-TWP-DML, 2017 WL 2214930, at *4 (S.D. Ind. May 19, 2017) (holding that uncontested facts showing continuity

New DirectBuy points to the "plain language" of the Purchase Agreement (DE 97-4) between CSC Generation, Inc., as Buyer, and Old DirectBuy,[21] to argue that Defendants' claim for successor liability is barred. The Purchase Agreement clearly demonstrates an intent by the parties thereto to negate successor liability for the purchasing company. It states, among other things, that CSC Generation, Inc. "will assume and be responsible for the Assumed Liabilities and no other Liabilities" (DE 97-4 at 23 (Purchase Agreement § 2.3)), and then further enumerates certain "Excluded Liabilities," including Defendants' counterclaims in this litigation (*id.* at 23-24 (Purchase

_____

of ownership, continuity of management and location, dissolution of old company, and continuity of services provided by the company and trade names under which those services were provided, were sufficient to establish a de factor merger); *Dugdale, Inc. v. Alcatel-Lucent USA, Inc.,* No. 1:09-cv-0960-JMS-TAB, 2011 WL 1532137, at *5 (S.D. Ind. Apr. 22, 2011) (finding disputed issues of fact as to mere continuation doctrine where the evidence showed the CEO of the old company was hired by the new company; some employees of old company hired by new company continued to work out of the same location; the new company continued to use the old company's phone numbers, email addresses, and website; and "continuity of business lines may exist because [the new company] purchased, among other things, [the old company's] intellectual property, customer and prospect lists, customer contracts, assumed contracts, and work in process").

[21] New DirectBuy asks the Court to take judicial notice of the Purchase Agreement (DE 97-4), as well as the bankruptcy court's Sale Order (DE 97-5) and Defendants' bankruptcy Proof of Claim forms (DE 97-1, 97-2, 97-3), all of which are found in the bankruptcy court record. *See* DE 97 at 8 n.1 (citing *inter alia Freeman v. Ocwen Loan Servicing, LLC,* No. 1:18-cv-3844, 2019 WL 3860354, at *2 (S.D. Ind. Aug. 16, 2019) (taking judicial notice of public filings and orders entered in a bankruptcy action)). Although it is not entirely clear whether the test for judicial notice cited by New DirectBuy (*see* DE 97 at 8 n.1 & n.2) is satisfied by Defendants' Proof of Claim forms, which technically are not found on the bankruptcy docket, the bankruptcy court papers in question (as well as any other filings in that matter) will be noted for what they say and the fact that they are part of the bankruptcy proceeding, and not necessarily for the truth of any factual matters asserted in them, some of which may be disputed in these proceedings.

Agreement ¶ 2.4(e)); *id.* at 93, 96 (Schedule 4.3 at No. 5)). But an argument based on the Purchase Agreement only demonstrates futility for a successor liability counterclaim based on an implied or express agreement to assume the obligation. As discussed, Defendants do not base their successor liability counterclaims on that exception to the general no-successor-liability rule; they rely instead on the fraudulent sale, de facto merger, and mere continuation exceptions.

New DirectBuy also distinguishes the Indiana successor liability case law cited by Defendants on the ground that those cases did not involve "a Section 363 sale." (DE 97 at 19). In this case, by contrast, New DirectBuy acquired Old DirectBuy's assets through a bankruptcy order (the "Sale Order") that approved the sale pursuant to 11 U.S.C. § 363(f). Section 363(f) authorizes bankruptcy courts, under any one of five prescribed conditions,[22] to allow the trustee[23] to sell a bankrupt's assets "free and clear of *any interest in such property.*" 11 US.C. § 363(f) (emphasis added). New DirectBuy argues that

---

[22] The five prescribed conditions include situations where "(1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f). There appears to be no dispute that at least one of these conditions is met here.

[23] "[A]lthough section 363(f) refers to the powers and obligations of the 'trustee,' these are powers and obligations which, in a Chapter 11 case, inure to the debtor-in-possession." *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC,* 327 F.3d 537, 545 (7th Cir. 2002) (citing 11 U.S.C. § 1107(a)).

26

Defendants' successor liability counterclaims were extinguished by Old DirectBuy's § 363(f) asset sale.

The only Indiana case the Court has found that touches upon the issue holds that a claim for successor liability under Indiana law remains viable even when there is an intervening bankruptcy. *See Sorenson*, 706 N.E.2d at 1099. But unlike here, *Sorenson* involved a post-sale tort, and there is general consensus among courts that a bankruptcy asset sale cannot immunize the purchasing company from successor claims that had not yet arisen at the time of the bankruptcy and therefore were not part of the bankrupt estate.[24] Nevertheless, a related argument that does apply here is that the successor liability claims against New DirectBuy did not arise until *after* the sale, because it was not until then that it became apparent that New DirectBuy was operating as a successor corporation to Old DirectBuy. *See Carpenters Health & Sec. Tr. of W. Wash. v. Paramount Scaffold, Inc.*, 159 F. Supp. 3d 1229, 1234 (W.D. Wash. 2016) (where the plaintiffs argued that their claims against the purchaser "arose post-bankruptcy after it became apparent that [the purchaser] was operating as a successor corporation to [the bankrupt corporation]"). In this regard, one legal commentor argues that courts that have held that successor liability claims are extinguished by a § 363(f) sale fail to properly understand the true nature of a state law claim for successor liability. *See* Rachel P. Corcoran, *Why*

---

[24] *See, e.g., Zerand-Bernal Grp., Inc. v. Cox*, 23 F.3d 159, 163 (7th Cir. 1994); *In the Matter of Mooney Aircraft, Inc.*, 730 F.2d 367, 374 (5th Cir. 1984); *Schall v. Suzuki Motor of Am., Inc.*, No. 4:14-cv-74-JHM, 2020 WL 1542388, at *6 (W.D. Ky. Mar. 31, 2020); *Schwinn Cycling & Fitness Inc. v. Benonis*, 217 B.R. 790, 795-96 (N.D. Ill. 1997).

*Successor Liability Claims Are Not "Interests in Property" Under Section 363(f)*, 18 AM. BANKR. INST. L. REV. 697, 698 (2010).[25] While successor liability claims are derivative of the seller's liability, they "also require[ ] action o[n] the part of the purchaser." *Id.* at 754. Thus, there is at least an argument that "it is not the transferred property that gives rise to the successor liability claim, but rather it is the purchaser's actions subsequent to the purchase of that property that imposes liability." *Id.* at 733; *see also Senco Brands, Inc. v. Ohio Dept. of Job & Family Servs.*, 70 N.E.3d 117, 126 n. 6 (Ohio Ct. App. 2016).

The Seventh Circuit's opinion in *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.* is somewhat consistent with this argument. In *Tasemkin*, the Seventh Circuit stated that "a second chance is precisely the point of successor liability, and it is not clear why an intervening bankruptcy proceeding, in particular, should have a *per se* preclusive effect on the creditor's chances." 59 F.3d at 51. As New DirectBuy points out, *Tasemkin* did not involve a § 363(f) sale. *See id.* at 50 n.2.[26] The Seventh Circuit concluded in that case, however, that "there is no reason to

---

[25] Available at *https://www.abi.org/member-resources/law-review/law-review-archives?field_lawreview_year_tid=1647* (last visited 3/7/2022).

[26] After the debtor in *Tasemkin* had filed for chapter 11 relief, a new entity "was incorporated for the purpose of obtaining the assets of [the debtor]" by acquiring the security interest of the debtor's secured lender. *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 172 B.R. 877, 878 (N.D. Ill. 1994), *rev'd*, 59 F.3d 48, 49 (7th Cir. 1995). Upon conversion of the case to chapter 7, the automatic stay was lifted in order to permit the new entity to foreclose on its collateral. *Id.* Having received no distribution on their ERISA claims in the bankruptcy proceeding, the successor liability claimants sought relief from the newly formed entity. *Tasemkin*, 59 F.3d at 49.

accord the purchasers of formally bankrupt entities some special measure of insulation from liability that is unavailable to ailing but not yet defunct entities," and permitted the federal successor liability claimants to proceed with their complaint against the new entity. *Id.* at 50, 51. *Tasemkin* is relevant here because other courts have precluded successor liability claims in the § 363(f) context based almost exclusively on policy considerations that the Seventh Circuit appears to have found in that case to be uncompelling. In any event, whether § 363(f) of the Bankruptcy Code is a legal bar to successor liability is a separate issue (dealt with later in this order) from whether Defendants can allege facts that would otherwise plausibly establish successor liability under Indiana common law. Accordingly, the Court is not persuaded by New DirectBuy's attempt to distinguish Indiana successor liability law on that basis, at least on the current record.

The only other arguments New DirectBuy makes as to whether Defendants can plausibly allege an Indiana state law claim for successor liability are based on contrary factual findings in the Sale Order. As discussed in the next section, New DirectBuy does not present a developed legal argument for why the factual findings in the Sale Order are binding on Defendants. Thus, at most, those findings contribute to disputed issues of fact, or at the very least issues that are not conclusively established on the current record. Defendants are not required to present evidence at the pleading stage of the proceedings to prove their version of the facts. They merely have to allege facts that plausibly give rise to a claim for successor liability. *See generally Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Further, because the facts in dispute are largely in the possession of New

DirectBuy, Defendants may allege those facts based "upon information and belief." *See, e.g., Azko Nobel Coatings Inc. v. Pearl Ave. USA, Ltd.*, No. 2:09cv540, 2010 WL 11564918, at *2 (E.D. Va. Feb. 23, 2010) (denying motion to dismiss where plaintiff argued it needed discovery to substantiate its allegation in complaint of successor liability, stating that "[p]leading 'upon information and belief' is appropriate when the factual basis supporting a pleading is in opposing party's possession").

### 3.   THE SALE ORDER

New DirectBuy relies primarily on the Sale Order and § 363(f) of the Bankruptcy Code (11 U.S.C. § 363(f)), for its arguments opposing the Motion to Amend. In unmistakably clear and repetitive terms, the Sale Order provides: (1) that the sale of Old DirectBuy's assets was "free and clear" of liens and claims of any kind other than those expressly assumed in the Purchase Agreement; (2) that the asset sale to New DirectBuy was not a fraudulent transfer or a de facto merger with Old DirectBuy; (3) that New DirectBuy is not a mere continuation of Old DirectBuy; and (4) that successor, transferee or vicarious liability of any kind or under any theory of law cannot be imposed on New DirectBuy following the sale. (*E.g.*, DE 97-5 at 8-11 (Bankruptcy Sale Order, ¶¶ P, T, U)). According to New DirectBuy, Defendants "were provided ample opportunity to object to Debtors' Motion [for approval of the asset sale], appear at the hearing, challenge the findings of the Sale or seek review of the Sale Order," but "did none of these things." (DE 97 at 18). New DirectBuy contends that Defendants cannot now "collaterally attack" the Sale Order by "attempt[ing] to re-litigate" in a different forum the issues addressed in that order. (*Id.*).

30

To the extent that New DirectBuy is attempting to make an argument based on the Sale Order that is distinct from its argument based on § 363(f) of the Bankruptcy Code, that argument is not sufficiently developed for the Court to address at this time. To begin with, there is no evidence before the Court from which it can conclude that, as a factual matter, New DirectBuy's assertions regarding Defendants' knowledge and/or participation in the bankruptcy proceedings are accurate. Indeed, New DirectBuy's assertion that Defendants did not object to the asset sale *might* even be false in that the bankruptcy court record shows that sale was objected to by the Unsecured Creditors Committee,[27] and one would assume that Committee represented Defendants.[28]

Furthermore, there is no evidence in the record that Defendants in fact received notice of the sale. New DirectBuy cites to the Sale Order, which recites that "all interested

---

[27] *See In re DB Holdings Liquidation, Inc.*, *supra* footnote 5, ECF No. 96 ("Objection by Official Committee of Unsecured Creditors to Debtors' Motion [for Sale of Property Free and Clear of Liens Under Section 363(f)]").

[28] Without more information about the bankruptcy proceeding, which New DirectBuy does not provide, the Court cannot say for certain whether the Unsecured Creditors Committee represented Defendants, or whether Defendants can be said to have been parties to the sale proceeding by virtue of the Committee's participation in those proceedings. *See, e.g., In the Matter of Met-L-Wood Corp.*, 861 F.2d 1012, 1017 (7th Cir. 1988) (noting that the unsecured creditors who appeared in the sale proceedings were parties to that proceeding, but not all unsecured creditors were represented and indeed not all had notice). If the Unsecured Creditors Committee did in fact represent Defendants, then the Court would want to understand the nature of that Committee's objections and the basis for the bankruptcy court's rejection of them, matters not currently discussed in the briefing. The point is that, in what is actually a complex situation, New DirectBuy simply assumes without showing that the ultimate facts are what it wants them to be, i.e., that Defendants were parties to the sale proceedings and failed to raise any objection to the sale.

persons and entities" had a "fair and reasonable opportunity to object and to be heard," including "all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Purchased Assets," and "those parties who have filed the appropriate notice requesting notice of all pleadings filed in the Chapter 11 Cases." (DE 97-5 at 6 (Bankruptcy Sale Order ¶ L)). But New DirectBuy makes no attempt to demonstrate that Defendants fall into one of the identified categories. Perhaps the Court is supposed to assume that they do based on their Proof of Claim forms, which New DirectBuy submits with its opposition brief. But those Proof of Claim forms state they were executed and mailed on February 2, 2017. (DE 97-1 at 24 (cover letter dated February 2, 2017); *see also id.* at 4; DE 97-2 at 4; DE 97-3 at 4). The Debtors' motion for court approval of the asset sale was filed on the same day as the bankruptcy petition--November 1, 2016,[29] months before Defendants executed and mailed their Proof of Claim forms. As best the Court can tell from the bankruptcy docket, objections to the sale were due by November 21, 2016,[30] again well before Defendants executed and mailed their Proof of Claim forms. And the hearing before the bankruptcy court to decide whether to approve the sale took place on February 10, 2017, eight days after Defendants' Proof of Claim forms were mailed.[31]

---

[29] *See In re DB Holdings Liquidation, Inc.*, *supra*, footnote 5, ECF No. 18 ("Motion for Sale of Property Free and Clear of Liens Under Section 363(f)").

[30] *See In re DB Holdings Liquidation, Inc.*, *supra*, footnote 5, ECF No. 49 ("Notice of Hearing of . . . [ECF No.] 18 . . . . Objections due by 11/21/2016").

[31] If there is other evidence in the bankruptcy court record to show that Defendants received timely notice of, and/or participated in, the sale proceedings, it is not up to the Court to search the bankruptcy docket (which is 115 pages long and consists of 783 entries) to find it. *See Fowler v. Werner Co.*, No. 1:13-CV-126-RLM-RBC, 2014 WL 4680732,

"[A] non-debtor plaintiff's successor liability claim against the debtor's asset purchaser is not extinguished by a § 363 sale where the plaintiff did not receive constitutionally adequate notice." *Schall*, 2020 WL 1542388, at *6 (citing cases). There has been no showing thus far that notice was *actually* mailed to Defendants at their correct address and that it was actually *received* by them. *See, e.g., Compak Cos., LLC v. Johnson*, 415 B.R. 334, 339 (N.D. Ill. 2009) (where assignee of debtor's assets admitted that notice was never sent to creditor at address listed in debtor's bankruptcy schedules, court rejects argument that it was sufficient that creditor "had actual notice of the sale through other channels" (citing *In re Metzger*, 346 B.R. 806, 818 (Bankr. N.D. Cal. 2006) ("In a chapter 11 case, the creditor who is not given notice, even if he has actual knowledge of reorganization proceedings, does not have a duty to investigate and inject himself into the proceedings.")). Without such a showing, New DirectBuy's arguments based on notice and an opportunity to object to the sale are far from compelling.

In any event, New DirectBuy does not explain the legal basis for holding that, even if they received notice and had the opportunity to object, Defendants are bound by the representations in the Sale Order (both as to notice having been received and an opportunity to object provided, and as to the sale being conducted in good faith without fraud and not constituting a de facto merger or mere continuation of the seller).

---

at *5 (N.D. Ind. Sept. 18, 2014) (Miller, J.) (cautioning parties against "cherry picking from the bankruptcy court's order and the Asset Purchase Agreement"). Perhaps all of the statements in the briefs are supported by the record. However, in the absence of citations the Court leaves that for another day.

Presumably, the legal basis would be either res judicata or collateral estoppel. But New

DirectBuy does not make any argument concerning application of those doctrines to the

facts in this case.[32] The cases cited by New DirectBuy are distinguishable in that they

mostly involve direct efforts to set aside the sale order itself.[33] Defendants' proposed

---

[32] The essential elements of res judicata are "1) a final judgment on the merits in an earlier action; 2) an identity of the cause of action in both the earlier and later suit; and 3) an identity of parties or privies in the two suits." *In re J.S. II, L.L.C.*, 389 B.R. 570, 584 (Bankr. N.D. Ill. 2008) (quoting *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 907 (7th Cir. 1990)). While the Sale Order "is considered a final judgment on the merits for purposes of *res judicata*," (*id.* (citing *In the Matter of Met–L–Wood Corp.*, 861 F.2d at 1016), New DirectBuy has not shown that Defendants' successor liability counterclaims and the bankruptcy sale order proceedings are the same cause of action, or that Defendants were in fact "parties or privies" in the bankruptcy proceeding. *See, e.g., In re Zota Petroleums, LLC,* 482 B.R. 154, 164 (Bankr. E.D. Va. 2012) (finding that the bankruptcy proceeding and later action seeking to assert an interest in the property sold at bankruptcy sale were not "based upon the same cause of action" and therefore "*res judicata* is not implicated, despite the argument . . . that the issue could have been raised"). Similarly, for collateral estoppel to bar litigation of an issue of law or fact, the issue to be precluded must be the same as that which was "actually litigated and decided in a prior action," "the determination of the issue must have been essential to the final judgment," and "the party against whom estoppel is invoked must be fully represented in the prior action." *In re J.S. II, L.L.C.*, 389 B.R. at 587 (quoting *La Preferida*, 914 F.2d at 906). And New DirectBuy has not presented any legal argument as to whether these elements have been met. *See, e.g., In re Zota Petroleums, LLC,* 482 B.R. at 164 (holding that the requirement for collateral estoppel to apply "that the issue must have been 'actually and necessarily determined' in the prior action" was not met); *see also Schall,* 2020 WL 1542388, at *8 ("the issue of whether SMAI could be held liable as a successor under Kentucky law requires resolution of issues of both law and fact that were not addressed by the Bankruptcy Court"); *Schwinn*, 217 B.R. at 797 ("the fact that New Schwinn is not a 'successor in interest' under the Sale Order does not adjudicate whether, under applicable state law, New Schwinn is liable as a successor of the Debtors in the Pennsylvania action").

[33] *See, e.g., In the Matter of Met-L-Wood Corp.*, 861 F.2d at 1018 (holding that a lawsuit by a bankruptcy trustee seeking damages from the seller, the purchaser, the purchaser's purchaser, a law firm involve in the transaction, and the secured creditors that benefited from the sale, was "a thinly disguised collateral attack on the judgment confirming the sale"); *Cummings Props., LLC v. Heidelberg Print Fin. Ams., Inc.*, No. Civ.A.01-11027-GAO,

34

successor liability counterclaim "does not seek to set aside the sale; rather, it requests a determination of the effect of the sale and so does not constitute an attack on the sale order." *In re Zota Petroleums, LLC,* 482 B.R. at 163. Indeed, in *Precision Industries*, one of the cases New DirectBuy cites, the Seventh Circuit specifically rejected the argument that the question of whether a bankruptcy court sale order extinguished the plaintiff's lease interest in the transferred property turned on the bankruptcy sale order. 327 F.3d at 543. Instead, the Seventh Circuit noted "that construction of the Sale Order rests on an understanding, albeit unstated, that section 363(f) permits the extinguishment of a lease." *Id.* Therefore, the Seventh Circuit concluded, what the sale order accomplished turned on the correct interpretation of § 363(f), not the terms of the Sale Order. *Id.* In short, as in *Precision Industries* and absent a more developed argument by New DirectBuy, resolution of the viability of successor liability claims in this case is likely achieved through construction of the statute, not through application of the terms of the Sale Order or arguments concerning a supposedly improper "collateral attack" on that Order. *Id.*

### 4. SECTION 363(f)

For the reasons explained below, the Court cannot resolve the § 363(f) question on the current record.

The Court first considers what constitutes an "interest" in property under § 363(f) for purposes of its "free and clear" treatment. Decisions by the Second, Third, and Fourth

---

2002 WL 1839252 (D. Mass. Aug. 12, 2002) (action brought by a party claiming a direct ownership interest in a printing press to set aside bankruptcy sale of the press).

Circuit Courts of Appeal have addressed that question and concluded that successor liability claims constitute "interests in property" within the meaning of § 363(f). *See Douglas v. Stamco*, 363 F. App'x 100, 102-03 (2d Cir. 2010) (unpublished) (barring tort claimant from bringing successor liability claim against purchaser of debtor corporation's assets based on § 363's "free and clear" language, citing underlying public policy concerns implicated by allowing such a claim, which included "inconsistent[cy] with the Bankruptcy Code's priority scheme," and "the potential chilling effect of allowing a tort claim subsequent to the sale"); *In re Trans World Airlines, Inc.*, 322 F.3d 283, 290 (3d Cir. 2003) (holding that § 363(f) asset sale extinguished rights under an EEOC settlement of class-wide employment-related claims because those claims qualified as an "interest in property" in the sense that "[h]ad TWA not invested in airline assets, which required the employment of the EEOC claimants, those successor liability claims would not have arisen"); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 582 (4th Cir. 1996) (holding that the rights of two employer-sponsored benefit plans to recover premium payments from bankrupt coal companies were "interests in property" within the meaning of § 363(f) on the theory that, "if [the coal companies] had never elected to put their assets to use in the coal-mining industry, and had taken up business in an altogether different area, the Plan and Fund would have no right to seek premium payments from them").

Unlike the Second, Third, and Fourth Circuits, the Seventh Circuit has never decided the meaning of "interests in property" in § 363(f) insofar as general unsecured claimants, including common law breach of contract and tort claimants, are concerned. But it addressed the question in *Zerand-Bernal Group, Inc. v. Cox*, where the issue was

36

whether a bankruptcy court had jurisdiction to entertain an adversary proceeding to enjoin a post-confirmation products liability case. The court acknowledged in its discussion of that jurisdictional question that the bankruptcy court had ordered that the sale of the debtor's assets was "free from all liens and other encumbrances," and observed that the bankruptcy court had the power to issue such an order under § 363(f). *Zerand-Bernal,* 23 F.3d at 163. But the court stated that the bankruptcy court's § 363(f) "cleansing" of the debtor's assets was not relevant to the product liability plaintiffs because they were "not attempting to enforce a lien." *Id.* That statement suggests that an "interest in property," which can be extinguished by a § 363(f) sale, is limited to liens, or at least that it does not include the claims of the product liability tort claimants at issue in that case.

While the quoted language in *Zerand-Bernal* may not be binding circuit precedent, *see In re Vista Mktg. Grp. Ltd.*, No. 12-B-83168, 2014 WL 1330112, at *7 (Bank. N.D. Ill. Mar. 28, 2014) (calling it "*obiter dicta*"), it provides a counterpoint to the statutory interpretation given to § 363(f)'s "interests in property" by the other circuit courts that have addressed the issue, as well as some support for Defendants' statutory interpretation argument. *See* (DE 98 at 4-5). Defendants point out that the "free and clear" discharge accorded by a Chapter 11 reorganization plan includes "all *claims* and interests" of creditors, et al., 11 U.S.C. § 1141(c) (emphasis added), while the "free and clear" sale under § 363(f) includes only "interests" in the property sold, suggesting that "claims" and "interests" are separate concepts. *See Schneider Nat'l Leasing, Inc. v. United States,* 11 F.4th 548, 554 (7th Cir. 2021) ("As in any statutory interpretation dispute, the 'proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself.'" (quoting

*Food Mktg. Inst. v. Argus Leader Media,* ––– U.S. ––––, 139 S. Ct. 2356, 2364 (2019))).[34] The previously cited commentator makes additional arguments for why it does not make sense to interpret "interest in property" in § 363(f) as including general unsecured claims under state common law, including an interesting one based on § 363(e) that has been all but ignored in the case law. *See* Corcoran, *supra*, 18 AM. BANKR. INST. L. REV. at 699, 702-05, 755-57.[35] The all-encompassing definition given to the term "interest in property" by

_____

[34] That argument may find further support in the fact that "claim" has a defined meaning in the Bankruptcy Code—it means "a right to payment" or "a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(5). Defendants' counterclaims for breach of contract and intentional infliction of emotional distress fall within the definition of "claims." A "lien," on the other hand, is defined as a "charge against or *interest in property* to secure payment of a debt or performance of an obligation" *Id.* § 101(37) (emphasis added). Thus, "claims" are defined with reference to a "right to payment," while liens are defined with reference to an "interest in property." A "right to payment" and an "interest in property," then, would appear to be distinct things. *See* Corcoran, *supra*, 18 Am. Bankr. Inst. L. Rev. at 717 ("a successor liability claimant simply possesses an *in personam* claim against the purchaser of assets whose conduct satisfies the requirements of one of the exceptions to the general rule of non-liability," and "an *in personam* claim under state law is not related to, nor does it create, an 'interest in property'"). Indeed, the Seventh Circuit seemed to recognize a "right to payment" as something distinct from an "interest in property" in *Precision Industries.* The court first quoted the definition of "interest" in Black's Law Dictionary: "A legal share in something; all or part of a legal or equitable claim to or right in property." 327 F.3d at 545 (citation omitted). With reference to that definition, the court then held that a possessory lease was "a (limited) right to the property itself" and "[t]hat right readily may be understood as an 'interest' in the property." *Id.* In so holding, the court distinguished a right *in* property, which it said equates to an "interest" in property from a right that is simply "connected to or arising *from* the property." *Id.* A "claim" would fall into the latter category and thus is at least arguably distinguishable from an "interest *in* property."

[35] Subsection (e) of § 363 provides that "on request of an entity that has an interest in property . . . proposed to be . . . sold . . ., the court . . . shall prohibit or condition such . . . sale . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). The argument goes as follows: If an interest in property under § 363(f) includes general unsecured claims of a right to payment, then subsection (e) would *require* a court to

the Third Circuit in *In re Trans World Airlines* was based to a large degree on policy considerations rather than an interpretation of the statutory text. Yet the aforementioned commentator argues that those policies are not actually furthered by that court's construction of § 363(f). *See id.* at 746-755.

In addition, the same policy considerations were mostly rejected by the Seventh Circuit in *Zerand-Bernard* and *Tasemkin*.[36] Of course, those cases were decided before *In re Trans World Airlines* and the other circuit court decisions addressing the § 363(f) issue. But

---

provide that general unsecured claimant "adequate protection" if a request for one was made. Adequate protection in bankruptcy law is a term of art that typically would require the court to grant the unsecured claimant a lien in the proceeds from the § 363(e) sale. So if the bankruptcy court followed the mandate in § 363(e) and granted adequate protection to a requesting unsecured claimant, doing so would have the unintended effect of converting that general unsecured claim into a secured claim, thereby subverting the priority scheme set out in the Bankruptcy Code, the very thing that courts that have interpreted § 363(f) as encompassing successor liability claims have sought to avoid by adopting that interpretation. *See* Cocoran, *supra*, 18 Am. Bankr. Inst. L. Rev. at 755-57; *see also Parker Drilling Mgmt. Servs., Ltd. v. Newton*, –– U.S. ––, 139 S. Ct. 1881, 1888 (2019) (emphasizing that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme") (internal quotation marks and citation omitted).

[36] *E.g. Tasemkin*, 59 F.3d at 50-51 ("it is neither certain nor clear that the chilling effect need give us pause: purchasers can demand a lower price to account for pending liabilities of which they are aware, and under federal successorship principles will not be held responsible for liabilities of which they had no notice"); *id.* at 51 (rejecting the argument that successor liability would frustrate the scheme of the Bankruptcy Code by giving unsecured creditors priority over secured creditors, stating among other things that, a successor liability claim "will have no effect on the bankruptcy proceeding—that is over and done with and the debtor . . . has ceased to be," so the successor liability suit "'cannot possibly affect the amount of property available for distribution to [the debtor's] creditors'" (quoting *Zerand-Bernal*, 23 F.3d at 162)); *Zerand-Bernard*, 23 F.3d at 163 (explaining why the argument that a bankruptcy court should or does enjoy blanket power to enjoin all future lawsuits against a buyer at a bankruptcy sale in order to maximize the sale price is unsound).

their timing alone should not decide their persuasive value. As another court in this circuit acknowledged, the basic premise of *Zerand-Bernal* and *Tasemkin* is not controversial: they "stand for the proposition that the mere policy concerns of not 'chilling' bankruptcy sales and of increasing the value of bankruptcy estate are not justifications for barring successor liability claims against purchasers of assets from bankrupt entities, especially where such claimants did not have an effective right to assert their interests in the bankruptcy proceeding." *In re Vista*, 2014 WL 1330112, at * 7. Here, the *only* arguments New DirectBuy seem to be making (or at least can make, given the lack of a record) is that those policy concerns by themselves warrant a *per se* rule, without reference to individual circumstances. Both *Tasemkin* and *In re Vista* took a broader look at the situation, and noted that prior opportunities for relief were relevant for determining whether to allow successor liability. *See Tasemkin*, 59 F.3d at 50; *In re Vista*, 2014 WL 1330112, at * 7-8.

That also was the approach taken by the bankruptcy court in *In re White Motor Credit Corp.*, 75 B.R. 944 (Bankr. N.D. Ohio 1987). As an initial matter, the *White Motor Credit* court read the statutory language of § 363(f) according to its plain language, reasoning that "[g]eneral unsecured claimants including tort claimants, have no specific interest in a debtor's property," and that "[t]herefore, section 363 is inapplicable for sales free and clear of such claims." *Id.* at 948. But the court went on to hold that those claims, which arose pre-confirmation, were nonetheless barred because the court had the equitable power to declare the assets free of any claims that fell within the scope of the debtor's later discharge. *Id.* at 948-49. Further, the court held, state law successor liability

claims that have been discharged under a plan of reorganization were preempted by federal bankruptcy law, "[a] primary purpose of [which] is to grant debtors a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Id.* at 950 (internal quotation marks and citation omitted). The court's concerns in that case echoed those of the Third Circuit, which "reasoned that allowing the claimants to seek a recovery from the successor entity while creditors which were accorded higher priority by the Bankruptcy Code obtained their recovery from the limited assets of the bankruptcy estate, would subvert the specific priorities which define Congressional policy for bankruptcy distribution to creditors." *In re Trans World Airlines*, 322 F.3d at 292 (internal quotation marks and citation omitted).

The court's ruling in *In re White Motor Credit* sheds some light on the policy arguments for reaching a similar conclusion in this case. Unlike in *In re White Motor Credit* (or *In re Trans World Airlines*, for that matter), there was no discharge of the debtor in this case. Instead, Old DirectBuy's Chapter 11 petition was *dismissed* without a discharge to Old DirectBuy. Therefore, there are no bankruptcy priorities at issue in this case for Defendants' successor liability claims to subvert. New DirectBuy does not mention the bankruptcy dismissal without a discharge, or attempt to explain how the dismissal affected the Sale Order. If the bankruptcy proceeding was ultimately terminated without a reorganization plan followed by a discharge, the question is raised but unanswered in the current record whether the previous Sale Order does or should continue to carry any force or effect for claims still being litigated. *See Schall*, 2020 WL 1542388, at *8 ("State successor liability law is preempted by federal law only to the extent that claims

'underlying the successor's liability have been discharged under a plan of reorganization.'") (quoting *Williams v. U.S. Bancorp*, No. CV-06-197-LRS, 2008 WL 4279409, at *4 (E.D. Wash. Sept. 12, 2008)); *see also Schwinn Cycling & Fitness Inc.*, 217 B.R. at 797.

In short, even if New DirectBuy's policy arguments should be factored into the statutory interpretation question presented here, the current, undeveloped record does not suggest such policy considerations are implicated. In this regard, it is worth noting that even a case that is persuasive and may ultimately support New DirectBuy's position was decided on a much fuller record in the context of a successful motion for summary judgment. *See Faulkner v. Bethlehem Steel/Int'l Steel Grp.*, No. 2:04-cv-34-PS, 2005 WL 1172748, at *2 (N.D. Ind. Apr. 27, 2008) (court adopts the policy arguments in *In re Trans World Airlines* in the absence of controlling Seventh Circuit precedent, making specific findings about the both the underlying claim and the bankruptcy sale). The Court concludes that the current record does not support a *per se* rule against state common law successor liability claims following in § 363(f) sale, which would bar Defendants' successor liability claims in the proposed amended counterclaims. *See Tasemkin*, 59 F.3d at 50, 51 (rejecting a "blanket rule" regarding viability of post-bankruptcy successor liability claims, suggesting each case turns on its own unique facts). The Court cautions that it has not reached any firm conclusions on the issues discussed herein. It simply is not persuaded by New DirectBuy's treatment of those issues at this time. The Court is willing to entertain further argument on the relevant issues on a more fully developed record.

**CONCLUSION**

For the foregoing reasons, the Motion for Leave to File Second Amended Counterclaim **(DE 90)** is **GRANTED**. Defendants shall file their Second Amended Counterclaim on or before **April 4, 2022**, and are further **DIRECTED** to take immediate steps to comply with the requirements of Federal Rule of Civil Procedure 4 for serving any new parties named in the Second Amended Counterclaim. *See* Fed. R. Civ. P. 25(a) (a motion to substitute or add a new party "shall be served on . . . persons not parties in the manner provided in Rule 4 for the service of summons, and may be served in any judicial district). In addition, **NOTICE** is given that the Verified Complaint **(DE 1)** will be dismissed without prejudice if an appearance by counsel is not entered on behalf of Plaintiff DirectBuy, Inc. on or before **March 31, 2022**.

ORDERED this 8th day of March 2022.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT

43